**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JOSEPH WEY,

    Plaintiff,

v.                                               Case No. 8:19-cv-1314-T-60JSS

CITY OF ST. PETERSBURG,

    Defendant.

_____/

**ORDER DENYING CROSS-MOTIONS**
**FOR PARTIAL SUMMARY JUDGMENT**

This matter is before the Court on "Plaintiff's Motion for Partial Summary Judgment," filed July 10, 2020. (Doc. 41). Defendant filed a response in opposition and cross-motion for partial summary judgment on September 15, 2020. (Doc. 52). Plaintiff filed his response opposing Defendant's cross-motion on September 29, 2020. (Doc. 55). Upon review of the motions, response, court file, and record, the Court finds as follows:

**Background**[1]

In January 2007, Plaintiff Joseph Wey began working as a Waste Water Operator trainee for Defendant City of St. Petersburg, Florida (the "City"). (Doc. 40 at 1). In 2009, Plaintiff received his wastewater license and was promoted to Water Reclamation Plant Operator II. (Doc. 53 at 1). In this position, Plaintiff worked night shifts at the City's Northwest Waste Water Facility ("Plant"), which operated

---

[1] For the purpose of ruling on the motions for summary judgment the Court must construe the facts and evidence in the light most favorable to the non-moving party.

24 hours a day, 365 days per year, and he was responsible for "lab analysis, samples, DO [dissolved oxygen] readings, in charge of chlorine, meter reading and clean up." (*Id.*; Doc. 40-1 at 16). Plaintiff alleges that during this time, it was common practice for operators to arrive up to fifteen minutes before their shifts began in order to participate in shift-change meetings, where the outgoing operator briefed the incoming operator on all that was going on at the Plant. (Doc. 40-1 at 45).

To calculate the time for which operators were to be paid, the City used the Kronos timekeeping system, which "round[s] up to an employee's start time if they clock in within 15 minutes of the start of their shift… [h]owever, at all other times, the system rounds down to the tenth of an hour." (Doc. 40 at 3). Put differently, if an individual is set to start his or her shift at 7:00 a.m. and logs in at 6:46 a.m., Kronos will round up and start the pay period at 7:00 a.m. *See id.* at 3-4. Furthermore, if an employee's shift is set to end at 7:00 p.m. and the employee logs in at 7:05 p.m., Kronos will round down and that employee will not be paid for the additional five minutes worked. *See (id.)*. This system was in place and applied to Plaintiff while he was employed by City.

On July 24, 2015, Plaintiff was diagnosed with Attention Deficit Disorder – Inattentive Type ("ADHD")[2] and was prescribed Adderall and, later, Vyvanse. (Doc. 40 at 4). He took medication daily to treat his condition for approximately a year and a half. (*Id.*). Despite this ongoing treatment, Plaintiff alleges that his condition

---

[2] Plaintiff refers to this condition as "ADHD." In the interest of consistency and clarity, the Court will do the same.

affected his ability to communicate, causing him to appear "mean or impolite" when talking in person, and "threatening and hostile" when communicating in writing. (*Id*. at 4-5). These difficulties communicating, Plaintiff alleges, were compounded by partial hearing loss he suffered while serving in the military, causing him to speak at an above-normal volume. (*Id*. at 5). Plaintiff informed the City of his ADHD diagnosis in August of 2015. (*Id*. at 2); Doc. 53 at 2). Plaintiff claims he then began facing discrimination due to his disability and complained to human resources as early as January 27, 2017. (Doc. 1 at ¶¶ 22-23).

Beginning in September of 2017, Plaintiff sent a series of tweets and "blast emails" to his co-workers, supervisors, City upper management, and news outlets raising various work-related complaints. (Doc. 40-1 at 112-13). Specifically, Plaintiff sent emails and tweets to St. Petersburg Mayor Kriseman, complaining that the Mayor "obviously doesn't care about his employees" due to a pay dispute that arose during Hurricane Irma. (Doc. 40-1 at 37); *see* (Doc. 53-1 at 30). The City then suspended Plaintiff's work email and placed him on temporary leave for violating the City's email policies. (Docs. 40-1 at 37; 53-1 at 30). This was reflected in an October performance review, which noted that Plaintiff "experienced an occasional outburst via email communications to management and other superiors," and set three performance goals for Plaintiff, all related to improving his communication in the workplace. (Doc. 40 at 2).

On December 9, 2017, Plaintiff sent another email, this time from his personal account – due to the restrictions placed on his work email – to human

resources complaining that he was being treated differently by his supervisor due to his disability. (Doc. 40 at 2). The City consequently suspended Plaintiff for three days on January 26, 2018. (*Id*. at 2-3). During this most recent suspension, Plaintiff sent an email to City employees and the Tampa Bay Times alleging that the City was violating the Fair Labor Standards Act ("FLSA"). (*Id*. at 3). Plaintiff sent an additional email claiming that he planned to file a formal discrimination charge. (*Id*.). Plaintiff was terminated on February 5, 2018. (Doc. 40-1 at 92).

On May 15, 2019, Plaintiff filed his complaint in Florida's Sixth Judicial Circuit in and for Pinellas County, Florida, alleging: (1) discrimination under the Florida Civil Rights Act (Count I), (2) retaliation under the Florida Civil Rights Act (Count II), (3) discrimination under the Americans with Disabilities Act (Count III), (4) retaliation under the Americans with Disabilities Act (Count IV), (5) unpaid overtime under the FLSA (Count V), and (6) retaliation under the FLSA (Count VI). (Doc. 1). Defendant removed the case to this Court on May 31, 2019. (*Id*.).

## **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A properly supported motion for summary judgment is not defeated by the existence of a factual dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Only the existence of a genuine issue of material fact will preclude summary judgment. *Id*.

The moving party bears the initial burden of showing that there are no genuine issues of material fact. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing the existence of genuine issues of material fact. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true and all reasonable inferences must be drawn in the nonmoving party's favor. *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).

Where, the moving party will bear the burden of proof on an issue at trial, demonstrating the absence of a genuine issue of material fact requires the submission of credible evidence that, if not controverted at trial, would entitle the moving party to a directed verdict on that issue. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Only if the moving party meets that burden is the non-moving party required to produce evidence in opposition. *Chanel, Inc. v. Italian Activewear of Fla. Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). Summary judgment should be denied unless, on the record evidence presented, a reasonable jury could not return a verdict for the non-moving party. *Id.*; *see also Fitzpatrick*, 2 F.3d at 1115-16.

The standard for cross-motions for summary judgment is not different from the standard applied when only one party moves for summary judgment. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court

must consider each motion separately, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)).

## Analysis

Plaintiff moves for partial summary judgment, requesting the Court to find, as a matter of law, that (1) the City's rounding policy violates the FLSA, and (2) that he has a disability as defined by the Americans with Disabilities Act ("ADA") and the Florida Civil Rights Act ("FCRA"). (Doc. 41). The City opposes Plaintiff's motion and moves for summary judgment itself, requesting the Court to find that (1) the rounding policy does not violate the FLSA, (2) that Wey has no ADA-recognized disability, and (3) Plaintiff failed to prove a prima facie case of retaliation under the ADA. (Doc. 52).

### *City's Rounding Policy Under the FLSA*

Both parties request the Court determine whether, as a matter of law, the City's rounding policy violates the FLSA.[3] Under the FLSA, employees are generally entitled to 1.5 times their normal hourly pay for every hour worked over forty hours per week. *See* 29 U.S.C. §207(a)(1). "An employer is not required,

---

[3] It is not contested that the City is a covered employer, and that Plaintiff is a non-exempt employee, under the FLSA. (Doc. 41 at 3).

however, to compensate an employee for all of the employee's time that is associated with work." *Kavanagh v. Grand Union Co.,* 192 F.3d 269, 272 (2d Cir. 1999).

The Portal-to-Portal Act, which amends the FLSA, identifies those employee activities that are not compensable under the statute. 29 U.S.C. § 251 *et seq*. An employer is not subject to liability under the FLSA for failure to pay employees overtime compensation for "activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a)(2). Preliminary and postliminary activities, however, are compensable if they are "an integral and indispensable part of the [employee's] principal activities." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 29-30 (2005); *Bonilla v. Baker Concrete Const., Inc.,* 487 F.3d 1340, 1344 (11th Cir. 2007); 29 CFR § 785.24. An employer is not required to pay employees for otherwise compensable activities if the time spent performing those activities is *de minimis*. 29 CFR § 785.47. Furthermore, the regulations promulgated under the FLSA permit employers to implement "rounding policies." 29 CFR § 785.48(b). These policies are only permissible so long as "[they] will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." *Id*.

Plaintiff's FSLA claim is based on the City's rounding policy, which excluded time spent at pre-shift meetings. Plaintiff contends the shift-change meetings were a necessary and integral part of the job because Waste Water Operators needed to

use these meetings to convey information so that they could adequately perform their duties.  The City disagrees and argues that the rounding policy is *de minimis* because these meetings were not indispensable for Plaintiff's job given that they were not officially required, and because a logbook was available for Plant operators to review that showed what occurred on the prior shift.

Here, outstanding issues of fact preclude this Court from ruling at the summary judgment stage that the shift-change meetings were necessary and therefore compensable.  For example, while the parties have extensively briefed these issues, it is still unclear what specific duties Plaintiff performed as a Waste Water Operator, and how the shift-change meetings impacted the functioning of the Plant.  Furthermore, without knowing what information was regularly included in the logbook and how often it was updated, it is impossible for the Court to determine whether the shift-change meetings were truly indispensable, or merely a time-saving courtesy among operators.  Since the Court must first determine whether the shift-change meetings are compensable before ruling on whether the rounding policy violated the FLSA, summary judgment is inappropriate.

The Court will nevertheless note that, should these meetings be found to be compensable, both the text of the applicable FLSA regulations and the test adopted by the Ninth and Tenth Circuits interpreting these regulations indicate this policy would violate the FLSA. [4]  *See Corbin v. Time Warner Entertainment-Advance/Newhouse P'ship*, 821 F.3d 1069, 1076-1077 (9th Cir. 2016) (holding that

---

[4] At this time, these are the only two circuits that have formally addressed this issue.

the FLSA requires rounding policies to be both facially neutral and neutral in application). Here, the City's rounding policy appears to have worked against the employees -- and in the City's favor -- 96% of the time, resulting in thousands of dollars of backpay owed to Plaintiff and his colleagues.[5] *See* (Doc. 41 at 8); 29 CFR § 785.48(b). It should be noted that in *Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1288-89 (10th Cir. 2020), the Circuit Court of Appeals seemed to agree that "a rounding policy that works in the employer's favor 94% of the time is probably not neutrally applied."

As such, the Court concludes that, while Plaintiff appears to have a strong argument on this point, issues of material fact preclude summary judgment in favor of either party at this time. Plaintiff's motion for summary judgment is therefore denied as to this ground, as is the City's motion for summary judgment.

### *Definition of Disability Under the ADA and FCRA*

Both parties request that the Court determine, as a matter of law, whether Plaintiff has a disability as defined by the ADA and FCRA. Since "disability discrimination claims under the Florida Civil Rights Act are analyzed using the same framework as claims under the Americans with Disabilities Act," this Court will conduct the analysis under the ADA.[6] *See Holly v. Clairson Indus., L.L.C.*, 492

---

[5] Based on documents submitted, the City has given on average $2,779.42 in unpaid wages, exclusive of liquidated damages, to 48 City employees. (Doc. 54-6); (Doc. 55 at 6-7). Plaintiff alleges that he is currently the only former City employee who hasn't yet received owed backpay. (Doc. 55 at 7).

[6] The ADA was amended by the Americans with Disabilities Act Amendments Act ("ADAAA"), which took effect on January 1, 2009. *See Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 467 (11th Cir. Aug. 31, 2012).

F.3d 1247, 1255 (11th Cir. 2007); *Irizarry v. Mid Fla. Cmty. Servs., Inc.*, No. 8:08-cv-00454-T-17TBM, 2009 WL 2135113, *2 (M.D. Fla. July 14, 2009).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1). Nevertheless, "not every impairment will constitute a disability within the meaning of [the ADA]." 29 C.F.R. § 1630.2(j)(1)(ii). In determining whether Plaintiff is disabled under the ADA, the Court must: (1) consider whether the alleged disability was a physical or mental impairment; (2) identify the activities impaired and determine whether they are "major life activities;" and (3) determine whether the impairment substantially limited these activities. *See, e.g.*, *Hudson v. Tyson Farms, Inc.*, 769 F. App'x 911, 915 (11th Cir. 2019) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)). Since symptoms of an impairment can vary widely from person to person, courts must review each disability claim on a case-by-case basis, with analysis based on the effect of that impairment on the life of the individual rather than simply on the name or diagnosis of the impairment. *Garret v. Univ. of Ala. at Birmingham Bd. of Trs.*, 507 F.3d 1306, 1311 (11th Cir. 2007); *Garavito v. City of Tampa*, 640 F. Supp. 2d 1374, 1379 (M.D. Fla. 2009) (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999)).

Plaintiff contends that ADHD is a mental impairment that substantially limits his communication skills. Other courts have recognized ADHD as a valid mental impairment. *See Karlik v. Colvin*, 15 F. Supp. 3d 700, 708 (E.D. Mich. 2014); 29 C.F.R. § 1630.2(h)(2) (broadly defining a "mental impairment" as "[a]ny

mental or psychological disorder"). In addition, communication has been determined to constitute a major life activity under the ADA. *See Cunningham v. Nature's Earth Pellets, L.L.C.*, 433 Fed. App'x. 751, 752 (11th Cir. 2011); 29 C.F.R. § 1630.2(h)(i)(1)(i) (explicitly including "communicating" as a major life activity).

Plaintiff must also establish that the undisputed facts show that his impairment *substantially* limits his ability to communicate. In his deposition, Plaintiff indicated his ADHD – combined with his hearing loss – causes him to speak louder than normal. He believes this causes his communication to unintentionally appear impolite or hostile, resulting in discrimination against him. Furthermore, the medical records he submitted indicate his ADHD has led him to be "verbally impulsive". (Doc. 54-6, Ex. B). However, these same medical records indicate his "expressive and communication skills [have been] normal" from his first recorded visit with his psychiatrist in July 2015, to his last in February 2017. (*Id.*).

Given that Plaintiff will bear the burden of proof on this issue at trial, demonstrating the absence of a genuine issue of material fact requires the submission of credible evidence that, if not controverted at trial, would entitle the moving party to a directed verdict on the issue. The Court finds that Plaintiff has not met his burden here. However, Plaintiff has provided sufficient evidence that a reasonable jury could find that his impairment substantially limits his communications skills. *See Irizarry v. Mid Fla. Cmty. Servs., Inc.*, No. 8:08-CV-00454-T-17TBM, 2009 WL 2135113, *3 (M.D. Fla. July 14, 2009) ("Determining whether the impairment substantially limits a major life activity is ordinarily a

question of fact for the jury; however, summary judgment is appropriate if Plaintiff fails to create a genuine issue of fact in this regard."). The parties' cross-motions for summary judgment on this issue are both due to be denied.

### *Disability Discrimination Claims*

The City also moves for partial summary judgment, requesting that the Court also find that, as a matter of law, it did not discriminate against Plaintiff because of his disability. Under the *McDonnell Douglas* framework – which applies to ADA and FCRA discrimination cases – the employee bears the initial burden of establishing a *prima facie* case of disability discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Cleveland v. Home Shopping Network*, 369 F.3d 1189, 1193 (11th Cir. 2004); *Holly*, 492 F.3d at 1255 ("… disability discrimination claims under the FCRA are analyzed using the same framework as ADA claims."). A *prima facie* case exists where a plaintiff shows he or she had "(1) a disability, (2) that [he or she] was otherwise qualified to perform the job, and (3) that [he or she] was discriminated against based on the disability." *Id*. Once a *prima facie* case is made, a presumption of discrimination is established, and the burden then shifts to the employer to "articulate a legitimate, non-discriminatory reason for the challenged action." *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). Once the employer comes forward with a legitimate reason "the presumption of discrimination is eliminated" and the plaintiff must then submit evidence that "the reasons given by the employer were not the real reasons

for the adverse employment decision," i.e. that the reasons given by the employer were pretextual  *Id.* at 1243.

Here, Plaintiff has made a *prima facie* case of disability discrimination by alleging he (1) has ADHD (which he testified about and supported with medical records from his Psychiatrist), (2) is otherwise qualified to perform the duties of a Waste Water Operator (which is not contested by the parties), and (3) was subjected to discrimination by receiving more performance reviews than his colleagues, being suspended, and ultimately being terminated from employment.

The burden then shifts to the City to proffer a legitimate reason for the challenged action.  To meet this burden, the City states that Plaintiff was not discriminated against based on his disability – rather, he received performance reviews, was suspended, and was ultimately terminated for sending impolite emails to his colleagues, superiors, high-ranking City officials, and news outlets, in violation of the City's Code of Conduct and email policy.  This is a legitimate and non-discriminatory reason for taking action against Plaintiff.  *See Llewellyn v. Sarasota Cty. Sch. Bd.*, 8:07-cv-1712-T-33TGW, 2009 WL 5214983, at *11 (M.D. Fla. Dec. 29, 2009) ("Defendant has offered a legitimate and non-discriminatory reason for taking action… [violation of a] Code of Conduct.").

At this point, the presumption of discrimination vanishes, and Plaintiff must present evidence that this stated reason is pretextual.  Specifically, Plaintiff relies on evidence that his supervisor called him "crazy" and that the chief of staff of his union referred to him as having "some kind of mental condition."  (Doc. 55 at 11).  In

addition, a colleague testified that "it was evident [Plaintiff] was being treated differently from others" and that he specifically "witnessed [Plaintiff's supervisor] treat him differently." (*Id.*). Because Plaintiff has submitted evidence to show that the City's reason is pretextual, City's motion for summary judgment is denied as to this ground. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) ("[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.").

### *ADA Retaliation Claim*

Finally, the City seeks partial summary judgment, requesting that the Court find that, as a matter of law, Plaintiff has failed to prove a *prima facie* case of retaliation under the ADA. A *prima facie* case of retaliation requires plaintiff to show that (1) he engaged in statutorily protected activity, (2) he suffered a materially adverse action, and (3) there was some causal relation between the two events. *Baston v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018). The City specifically contends that the conduct Wey engaged in, sending multiple tweets and blast emails to his colleagues, superiors, the Mayor of St. Petersburg and the Tampa Bay Times, is not a statutorily protected activity and therefore City did not retaliate against Plaintiff in violation of the ADA.

The Court disagrees. Here, Plaintiff engaged in a statutorily protected activity by complaining to his superiors and others that he was the being discriminated against because of his disability. *See Batson v. Salvation Army*, 897

F.3d 1320, 1329 (11th Cir. 2018). Plaintiff also alleges that he suffered materially adverse actions – including being suspended and being terminated – as a result of raising his discrimination complaints. *See id*. This is all that is needed to state a *prima facie* case for retaliation under the ADA. Accordingly, the City's motion for summary judgment on this issue is denied.

It is therefore

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1) "Plaintiff's Motion for Partial Summary Judgment" (Doc. 41) and "Defendant, City of St. Petersburg's, Response to Plaintiff's Motion for Partial Summary Judgment, Motion for Summary Judgment and Memorandum of Law in Support" (Doc. 52) are both hereby **DENIED**.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 8th day of December, 2020.

 

**TOM BARBER**
**UNITED STATES DISTRICT JUDGE**